HEMOLIN CO. v. HARWAY DYEWOOD & EXTRACT MFG. CO. et al.

(Circuit Court of Appeals, Second Circuit. December 15, 1908.)

No. 94.

PATENTS (§ 318*)—SUITS FOR INFRINGEMENT—MEASURE OF PROFITS RECOVERABLE.

On an accounting for profits made by an infringer of a patent for a process of treating logwood extract, either in the form of a liquid or hematine paste, to convert it into a dry and nonhygroscopic powder, both the liquid and paste being well-known marketable commodities, the measure of recovery is the difference between the cost of the patented product and the price at which it was sold, taking the liquid or paste used at its market value, and not at the cost of its manufacture, where it was made by defendant.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 570; Dec. Dig. § 318.*

Accounting by infringer for profits, see note to Brickill v. Mayor, etc., of City of New York, 50 C. C. A. 8.]

Appeal from the Circuit Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a final decree confirming the report of a master and holding the infringing defendant liable for $13,987.11 profits.

W. P. Preble, Jr., for appellant.
Harold Binney, for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. There is no dispute as to the facts, nor as to the figures upon which the amount of profits is to be determined. A question of law alone is presented upon this appeal. The

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

patent was sustained by this court in 138 Fed. 54, 70 C. C. A. 480, which concluded that:

"The essence of the invention is that when logwood extracts are treated with nitrate of soda or potash, under such conditions as to bring about a reaction between them, a new product, consisting of a permanent dry powder, soluble in cold water and rapidly soluble in hot water, is produced, in which the gummy matters are expelled or rendered nonhygroscopic. The prominent characteristic and effective feature of this product, which distinguishes it from those of the prior art, consists in the fact that it retains its permanent quality when exposed to atmospheric conditions, and for that reason possesses peculiar practical utility and commercial value."

Prior to the patent stick logwood was converted into the logwood extract by cutting the wood into chips for boiling in water. Boiling dissolved the coloring matter of the logwood, and the solution was drawn off as liquid logwood extract. Some of these extracts were weak, and others more concentrated by evaporating the water of solution to a greater or less extent; the coloring matter occupied less bulk. The liquid extracts were all salable at prices which varied with the strength of the extract. These liquid extracts were also further treated—either slowly by simple exposure to atmospheric air, or quickly by the use of certain chemicals, such as ammonia. The resulting products were called "hematines," and were sold sometimes in the form of liquid, sometimes as a paste. There were also powdered extracts or logwood prepared by still further treatment, but not by the process of the patent. These powders, however, were hygroscopic. They were not permanently dry powders, but liquified on exposure to a humid atmosphere. Powders produced by the patented treatment, however, became nonhygroscopic. The product of the patent is made by a special process of drying by the aid of a nitrite.

All these earlier varieties of logwood dyes, fluid extract, paste, and hygroscopic powders have continued to be made and sold since the patent. They are well-known articles on the market, and have not been displaced by the patented article. Defendant makes and sells them all, and during the period covered by the testimony it also made and sold infringing nonhygroscopic powders. It made them by taking hematine paste and treating it in the manner indicated in the patent. The total amount of these powders made and sold during the period was 753,796 pounds. The master determined the rate of profit per pound by ascertaining the cost of all the steps in the process which produced the infringing powder from the chips and deducting the amount from the selling price. To this defendant objected that the profits recoverable are merely those obtained by the use of nitrite of soda in the process of making the infringing powders, and not the total profits derived from these sales; that the proofs fail to show what part of the profits, if any, was due to the use of the nitrite; that the evidence in the case shows that the use of the nitrite merely makes the powder more convenient to handle and more easily capable of exact measurement, without affecting its tinctorial power; and that, therefore, complainant, having failed to show what part of the profits is due to the use of the nitrite, has proved nothing and can recover only nominal damages.

Apparently defendant does not now insist upon this proposition, for his brief states that his "personal figuring of the record" would be three-fours of a cent a pound as profits which arose from the fact that the infringing powders were permanently dry. There is nothing in the brief to show how this amount is arrived at, so we have no means of determining whether it is correct or not. In our opinion the master's figuring was erroneous, because it failed to take into account as an item of cost the profit which defendant would have made upon the paste, had it sold the dye in that form, instead of advancing it by the patented process into the patented product. The raw materials of the patent are the paste and the nitrite, which are to be treated together to produce the result. In figuring profits obtained by use of the process of the patent, the first element is the market price of the raw materials employed. The circumstance that defendant made the paste is as immaterial as would be the circumstance that he made the nitrite. Both of these substances are well-known marketable commodities, wholly outside the patent. If the infringer buys them of some one else at the market price, that is an element of cost. If he buys them of himself, he is entitled to have their cost taken as including the profit he would have had to pay the outsider. In producing those commodities, not covered by the patent, he is entitled to whatever profit he has earned, and the patentee may not call him to account for one penny of it.

The briefs of counsel on both sides discuss the case as if it involved some abstruse theories of accounting for profits. We do not so understand it. The proposition seems to be a simple one. The defendant had a certain quantity of hematine paste. Some of it he sold as paste. Some of it he treated in the nonpatented way, selling it as one of the old dry powders. Some of it he treated as the patent directed, and sold the proceeds as the nonhygroscopic powder. Why did he do so? Why did he not sell it as paste, or turn it into old-style powder? Why did he take additional trouble to follow the patented process, and risk being prosecuted as an infringer? Manifestly because he was convinced that by so doing he would extend his sales and dispose of a greater quantity of logwood dyes by securing purchasers among those who, for one reason or another, preferred the permanently dry powder to the paste or the old-style powder. His conviction was justified by the event, for he succeeded in selling the product of his infringement. Why, under those circumstances, he should not account for the profits he made in selling paste transformed into nonhygroscopic powder by the patented process, we fail to see, and we are referred to no authority which denies such profits to the patentee.

The decree of the Circuit Court should be reversed, with costs of this appeal, and the cause remanded, with instructions to eliminate the items of cost which produced the paste, and to substitute therefor the market price of the paste.